UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 95-30347
_____


EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff-Appellee,

versus

ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW,

Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Louisiana
(CA-93-597-G)

March 20, 1996

Before JONES, EMILIO M. GARZA, and BENAVIDES, Circuit Judges:

EDITH H. JONES, Circuit Judge:[*]

The Association of Community Organizations for Reform Now ("ACORN") appeals the district court's grant of summary judgment in favor of the Equal Employment Opportunity Commission ("EEOC"), ordering ACORN to comply with EEOC reporting requirements by filing an Employee Information Report ("EEO-1") for every year since 1990. After reviewing de novo the district court's grant of summary judgment and after considering the evidence in the light most favorable to ACORN, this court AFFIRMS.

_____

[*] Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

ACORN is a multi-state, nonprofit advocacy organization dedicated to the advancement of low and moderate income Americans. While twenty-nine states and the District of Columbia authorize ACORN to conduct its advocacy activities, it has offices only in four states. Since at least January of 1990, ACORN has continuously employed over 100 persons.

Title VII of the Civil Rights Act of 1964 requires employers to file with the EEOC an Employers Information Report, or EEO-1, if they employ at least 100 employees in the fifty states. 42 U.S.C. § 2000e-8(c). Even though ACORN employs the requisite number of personnel to trigger this reporting requirement, it has consistently refused to complete and file an EEO-1 since January of 1990.

Seeking to redress ACORN's refusal, the EEOC filed suit in the Eastern District of Louisiana. ACORN initially replied that the EEOC lacked jurisdiction over it because ACORN was not an organization "affecting commerce." ACORN further argued that the EEOC's reporting requirements unconstitutionally impinge on its First Amendment rights to association, expression, and organizational privacy. The district court, rejecting each of these contentions, ordered ACORN to file an EEO-1 report for every year since 1990.

This court reviews the district court's grant of summary judgment de novo, employing the same criteria under Fed. R. Civ. P. 56 used in that court. *Burfield v. Brown, Moore & Flint, Inc.,* 51 F.3d 583, 588 (5th Cir. 1995).

## 1.    Jurisdiction: "Affecting Commerce"

Employers subject to Title VII must engage in activities that "affect commerce." *See* 42 U.S.C. § 2000e(b). ACORN contends that the district court erred when it concluded that ACORN's advocacy activities affect commerce in such a manner that the EEOC can assert jurisdiction over ACORN through Title VII.

The Supreme Court has instructed that the phrase "affect commerce" evinces the intent of Congress to exercise the full extent of its power under the Commerce Clause. *Polish Nat'l Alliance of the U.S. v. NLRB,* 322 U.S. 643, 647, 64 S.Ct. 1196, 1198 (1944). Likewise, this court has held the phrase should be construed liberally to effectuate and maximize the remedial purposes of Title VII. *See, e.g., Harvey v. Blake,* 913 F.2d 226, 227 (5th Cir. 1990). *See also, EEOC v. Ratliff,* 906 F.2d 1314, 1316 (9th Cir. 1990) (jurisdictional requirement that an employer's activities affect commerce is easily satisfied). Even though an organization such as ACORN does not operate for profit, if its activities affect commerce, the organization is nonetheless subject to Title VII. *See NLRB v. Yeshiva Univ.,* 444 U.S. 672, 681 n.11, 100 S.Ct. 856, 862 n.11 (1980); *NLRB v. Lighthouse for the Blind,* 696 F.2d 399, 404 n.21 (5th Cir. 1983); *McClure v. Salvation Army,* 460 F.2d 553, 557 (5th Cir.), *cert. denied,* 409 U.S. 896 (1972).

Construing the commerce requirement of Title VII liberally, the district court properly concluded that ACORN's activities affect commerce. Facts stipulated by ACORN prove as much. ACORN has offices in three states as well as the District of

Columbia and either conducts business or is registered to do so in twenty-seven other states. It employs continuously at least 100 persons per year, while regularly employing nearly 500 employees yearly. ACORN frequently conducts business with other companies engaged in interstate commerce. It rents commercial property in several states. It withholds from its employees' paychecks federal income taxes, OASDI taxes for Social Security and Medicare and various state and local income taxes.

Considering the nature and extent of ACORN's business activities, the district court reasoned that if ACORN were to shut down, the cessation would burden or obstruct commerce because "[m]ail and phone services would no longer be utilized. Office supply and repair services would no longer be utilized. Various media forms would be affected. And, finally, hotel[s] and airlines would be impacted." Moreover, in its advocacy activities, ACORN sometimes undertakes deliberately to affect commerce in order to promote social change. These connections to commerce may be small in absolute terms, but they are sufficient to characterize ACORN as an employer that affects commerce under the purview of Title VII. *See, e.g., Polish Nat'l Alliance,* 322 U.S. at 645–46, 64 S.Ct. at 1198 (concluding that a fraternal benefit society providing insurance to members in twenty-seven states was subject to the NLRA because its activities affected commerce); *NLRB v. Imperial House Condominium,* 831 F.2d 999, 1005 (11th Cir. 1987) (holding that an entity which is principally noncommercial and produces no commodities nevertheless affects commerce by meeting payroll,

4

paying taxes, and transacting with other businesses engaged in interstate commerce).

Contrary to ACORN's suggestion, this result is not undercut by *United States v. Lopez,* ___ U.S. ___, 115 S.Ct. 1624, 1629-30 (1995). In *Lopez,* the Supreme Court affirmed this court's determination that the Gun-Free School Zones Act ("Act") exceeded congressional authority under the Commerce Clause because the Act contained no "express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection or effect on interstate commerce." *Lopez,* ___ U.S. at ___, 115 S.Ct. at 1631. Since there was no particularized showing of a link between the mere possession of a firearm near a school and interstate commerce, the Court held the Act unconstitutional, explaining that

> [t]he possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce. Respondent was a local student at a local school; there is no indication that he recently moved in interstate commerce, and there is no requirement that his possession of the firearm have any concrete tie to interstate commerce.

*Lopez*, ___ U.S. at ___, 115 S.Ct. at 1634.

Unlike the Act overturned in *Lopez,* Title VII has express jurisdictional provisions intended to demarcate congressional authority. *See, e.g.,* 42 U.S.C. § 2000e(b). Further, as discussed earlier, despite ACORN's assertion that its advocacy activities are neither economic nor commercial, the organization's activities affect commerce, by means of the hiring of employees in several

5

states, the purchasing of supplies, the rent or purchase of commercial property, and the use of airline, hotel, media and other communication services. In this case, unlike *Lopez,* there is a discernible link between ACORN's activities and interstate commerce sufficient to subject ACORN to the EEOC's jurisdiction.

**2. First Amendment Claims**

**a. Right of Private Association**

ACORN alternatively contends that EEOC's reporting requirements including the EEO-1 are unconstitutional, violating ACORN's right of private association. ACORN asserts that when individuals associate for noncommercial reasons, the First Amendment imposes upon government a heavy burden to justify any attempts to regulate such association. *See, e.g., Federal Election Comm'n v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 107 S.Ct. 616 (1986); *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 97 S.Ct. 1782 (1977). The district court disagreed that ACORN was entitled to strenuous First Amendment protection, concluding that

> ACORN lacks the personal, family-like relationship required to entitle it to 'private association' protection. It is both large in size and solicits contributions from total strangers. The 'private association' aspect of the freedom of association protected by the First Amendment is not applicable to the case at bar.

To support its claim that the district court erred, ACORN relies on the right of "identity construction" purportedly announced in *Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244 (1984). In *Roberts,* the Supreme Court instructed that

> [b]ecause the Bill of Rights is designed to

6

> secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State . . . . [C]ertain kinds of personal bonds have played a critical role in the culture and tradition of the Nation by cultivating and transmitting shared ideals and beliefs . . . . Protecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty.

*Roberts,* 468 U.S. at 618-19, 104 S.Ct. at 3250. The Court identified factors that suggest whether a relationship merits First Amendment protection: the small size of the related group; the selectivity involved in creating and maintaining the affiliation; and the seclusion from others in critical aspects of the relationship. *Roberts,* 468 U.S. at 620; 104 S.Ct. at 3250.

But the First Amendment right articulated in *Roberts* does not extend to ACORN. In *Roberts,* the Court posited that the relationships which merit such First Amendment protection are deeply personal, such as those that "attend the creation and sustenance of family [including] marriage, childbirth, the raising and education of children, and cohabitation with one's relatives." *Roberts,* 468 U.S. at 619; 104 S.Ct. at 3250. Although the Court later acknowledged in *Board of Directors of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 545, 107 S.Ct. 1940, 1946 (1987), that this associational right is not limited to relationships among family members, it does "presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and

7

beliefs *but also distinctly personal aspects of one's life.'"* (*quoting Roberts,* 468 U.S. at 619-20, 104 S.Ct. at 3250) (emphasis added).

The bond between members of ACORN is simply not the type of relationship contemplated by either *Roberts* or *Rotary Int'l* that would merit First Amendment protection for "identity construction." After all, ACORN is a relatively expansive group with members in twenty-nine states and the District of Columbia. The advocacy group's activities are rarely secluded; rather, many of its activities, including recruiting members, promoting legislation, referenda or other political action, and mobilizing public opinion and consumer response are decidedly and intentionally public. ACORN cannot demonstrate that its activities result from a deeply personal relationship among its members that merits First Amendment protection in the way that familial relationships and others that "have played a critical role in the culture and tradition of the nation" assuredly do. *Roberts,* 468 U.S. at 618, 104 S.Ct. at 3250. The First Amendment right of private association does not insulate ACORN from compliance with the EEOC's reporting requirements, including EEO-1.

**b. Right of Expressive Association**

ACORN also asserts that its hiring practices, hence, its right of expressive association, would be profoundly affected by these reporting requirements, since compliance would enable the EEOC to monitor, control, and publicize ACORN's employment practices. ACORN speculates further that this impact on its

employment practices would enable the EEOC to regulate indirectly, yet impermissibly, the content of ACORN's advocacy. To ACORN, the district court erred when it concluded that compliance with the EEOC's reporting requirements would not impede ACORN's advocacy and that, moreover, "there is no [constitutional] basis for selectivity in terms of who should convey [ACORN's] message."

ACORN's complaints are unfounded, however, because the EEOC reporting requirements simply do not regulate speech, attempt to suppress advocacy by ACORN, or impose viewpoint discrimination or any other constitutionally impermissible criteria on ACORN. Neither in oral argument nor in its briefs to this court did ACORN demonstrate how compliance with EEO-1 would in any way impede its advocacy activities. The EEO-1 merely requires an employer to report the number of its employees and identify its employees' racial and gender classifications. Because compliance with the EEOC reporting requirements does not restrict or interfere with ACORN's advocacy in any articulated way, the district court properly concluded that such compliance does not implicate ACORN's associational rights under the First Amendment.[1] *See, e.g., Board of Directors of Rotary Int'l v. Rotary Club of Duarte, supra*, 481 U.S. at 548, 107 S.Ct. At 1947 ("evidence fails to show how admitting women to Rotary Clubs will affect in any significant way

---

[1] Even if ACORN is concerned that its ability to advocate somehow requires it to ignore compliance with Title VII and to hire on the basis of discrimination, that problem does not arise in this lawsuit. Filing EEO-1 reports does not dictate ACORN's hiring practices. If and when a Title VII enforcement action is filed against ACORN for employment discrimination, the advocacy group may renew its First Amendment defense.

9

the existing members' ability to carry out their various purposes.")

### c. Organizational Right to Privacy

Finally, ACORN argues that it enjoys a constitutional, organizational right to privacy that is somehow invaded because the information required by the EEO-1 would allow ACORN's opponents to exploit information concerning the organization's demographics. Therefore, ACORN concludes, the government should be precluded from compelling ACORN's compliance with the reporting requirements absent a showing that this compliance substantially advances an important governmental interest.

But ACORN's concerns are again unsupported. The EEO-1 does not require ACORN to divulge the names, identities, or any other personal information about either its employees or members. Instead of identifying such employees or members by name or address, the data comprise a statistical analysis of the racial and gender composition of ACORN's workforce. Because the EEO-1 does not require ACORN to provide sensitive or personal information, it does not interfere with whatever organizational privacy rights that ACORN may enjoy. *See, e.g., Tony & Susan Alamo Found. v. Secretary of Labor,* 471 U.S. 290, 305-06, 105 S.Ct. 1953, 1963-64 (1985) (upholding the record keeping requirement of the Fair Labor Standards Act as a "routine and factual inquiry" that falls short of unjustified governmental surveillance).

### CONCLUSION

For the foregoing reasons, this court AFFIRMS the

10

district court's grant of summary judgment in favor of the EEOC and its order that ACORN comply with EEOC reporting requirements by filing an EEO-1 for every year since 1990.